# Smith Investigation & Support Services, LLC

*Private Investigations, Accident Reconstruction and Legal Support Services*

Post Office Box 18398
Fairfield, Ohio 45018

Telephone: 601-927-7817

("L J.")

*Lorne Smith, Jr*

*Linda Smith*

June 4, 2017

Barry B. Sutton, Esq.
Clark Hill, PLC
151 Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009

> RE:   ***Memorial Hermann Health System v. David Snyder v. Bass Pro Outdoor World, LLC and American Sportsman Holdings Co., formally known as Bass Pro Shops, Inc.;*** **United States District Court, Eastern District of Texas, Lufkin Division; Civil Action No. 9:15-CV-135**

Dear Mr. Sutton:

In preparing to give my opinions in the above titled case, I have read or reviewed the following materials:

- Written transcript of the Videotaped Deposition of David L. Snyder, MED, taken on March 1, 2017, with exhibits;

- Written transcript of Darren Hogan, taken on April 28, 2015;

- Deposition of Danette Snyder Willey taken on June 2, 2017;

- Deposition of Jeremy Townsend taken June 1, 2017;

- Deposition of Grover Worsham taken on June 1, 2017;

- Deposition of Lina Snyder taken on June 2, 2017;

- Deposition of Louis Snyder taken on June 2, 2017;

- Deposition of William Randall Watts taken on June 1, 2017;

- Deposition of Richard Wiley taken on June 2, 2017;

- Deposition of Samuel Blair taken on June 1, 2017;

- Deposition of Samuel Shanafelt taken on June 1, 2017;

- Deposition of Shannon Worsham taken on June 1, 2017;

- Petitioner's Verified Petition to Take Rule 202 Depositions with attached Notice of Hearing and proposed Order;

- Plaintiff's Motion for Order Permitting Detailed Examination of the Product with Exhibits;

- Rule 26(a)(1) Disclosures of Defendant Bass Pro Outdoor World, LLC;
  Bates Stamped No. BPRO 000695-000849

- Defendant/Third-Party Plaintiff David Snyder's Answers and Objections to Defendant Bass Pro Outdoor World, L.L.C.'s First Interrogatories;

- Defendant/Third-Party Plaintiff David Snyder's Responses and Objections to Defendant Bass Pro Outdoor World, L.L.C.'s First Request for Production;

- Defendant/Third-Party Plaintiff David Snyder's Initial Disclosures Pursuant to Federal Rules of Civil Procedure 26(a)(1)(A);

- Defendant/Third-Party Plaintiff David Snyder's First Supplemental Responses to Initial Disclosures Pursuant to Federal Rules of Civil Procedure 26(a)(1)(A);

- Defendant/Third-Party Plaintiff David Snyder's Second Supplemental Responses to Initial Disclosures Pursuant to Federal

Rules of Civil Procedure 26(a)(1)(A) and Designation of Expert Witnesses;

- Plaintiff David Snyder's Third Supplemental Response to Initial Disclosures, together with CD containing videos;

- Plaintiff David Snyder's Fourth Supplemental Responses to Initial Disclosures, together with attached documents;

- Plaintiff David Snyder's Fifth Supplemental Responses to Initial Disclosures;

- Plaintiff David snyder's Sixth Supplemental Response to Initial Disclosures with attached documents;

- API Outdoors "Climbing Treestands Assembly & Usage Instructions"

- Various Photographs;

- C. Kendall Clarke, Ph.D., P.E.'s "Evaluation of Chain Separation" and Resume;

- Stephen Pustilnik, M.D.'s Report and C.V.;

- Anthony M. Gamboa, Jr., Ph.D., M.B.A. C.V.;

- "Life Care Plan and Cost Analysis" for David Snyder prepared by MediSys Rehabilitation, Inc.;

- Letter from the U.S. Consumer Product Safety Commission to the President of Outdoor Technology Group, LLC, with attachments;

- NBEF "Safe Treestand Hunting Strategies" video;

- TMA Certification Data for API Tree Stands, including climbing treestands;

- Texas Parks and Wildlife Department "Hunting Accident and Incident Report Form;

Barry B. Sutton, Esq.
June 4, 2017
Page Number 4

- Groveton Emergency Medical Services records;

- Bass Pro production documents;

- Departmental Training Procedures Outline Bates Stamped BPRO 001237-BPRO 001275;

- Photographs from various API catalogs.

I also personally inspected the subject treestand on May 12, 2015, and subject exemplar treestands and    site on January 24, 2017.

In addition to the above-listed materials, I rely on my personal experience as a hunter for over 50 years and a treestand hunter for over 35 years.    Attached hereto you will find a copy of my C.V.

In summary of my background, I have been a certified Hunter Safety Instructor with the Mississippi Department of Wildlife, Fisheries and Parks for over 34 years. I was employed with the Mississippi Department of Wildlife, Fisheries and Parks as a Conservation Officer from 1973-1993.    In addition, I was the Administrator of the Mississippi Hunter Safety program from 1983-1993 when I retired from the State of Mississippi.

I am a Past-President of the International Hunter Safety Administrators Association and spent seven years on their Board of Directors.    In 1986, I helped write the instruction manual that was used by almost all of the states to teach hunter safety.

In 1997, I wrote, directed and produced a treestand safety video that was used by numerous states to teach treestand safety in hunter safety classes.    Over 44,000 copies of this video were sent to hunter safety instructors.    In 2005, I assisted the International Bowhunter Education Program in writing a treestand safety course that teaches instructors how to teach treestand safety in the classroom.    I am one of four certified instructors teaching this course, and I have assisted in training over two thousand five hundred instructors in    over twenty states this course over the last eleven years and

Barry B. Sutton, Esq.
June 4, 2017
Page Number 5

over four thousand instructors in treestand safety since 1995.   I have assisted in writing (both) and producing (one)of the video's that are now co-packaged with all treestands sold in this country including the one shipped with the treestand in this case.

I have been investigating hunting accidents since 1979 and began teaching a hunting accident investigation course in 1990.   I am still teaching the course on hunting and treestand accident investigations and reconstructions.   I have taught the treestand accident investigation and reconstruction course to over 370 wildlife officers in Alabama (3 classes), Illinois, Iowa (at the IHEA Incident investigation school), South Carolina (3 classes), Maryland, New Hampshire, Kansas, Georgia, Connecticut, Pennsylvania, Massachusetts, West Virginia, Louisiana (6 classes)   and Indiana in the past five years. I have investigated over 700 hunting accidents with over 450 of these being treestands. I have given numerous depositions in hunting accident cases with 65 of these involving treestands. I have testified in both Federal and State Courts in hunting accident cases over 20 times with a majority of those involving treestands.   The attached C.V. lists my other qualifications.

## I.    TREESTAND AND SITE INSPECTIONS:

### A.    Initial Inspection of Stand on May 12, 2015:

Upon arrival at the Plaintiff's attorney's law firm in Houston, the subject treestand was lying on a conference table.    The chain to the foot platform was inserted into the stand while the chain for the seat platform was in a box on the table.

There was an API label along with a TMA label attached to one of the risers of the seat platform. The sling seat was attached to the platform.    There was an "EVIDENCE" tag on the stand that read: "EVIDENCE.   If for any reason this item becomes lost or undeliverable, please contact: On the other side: The Ammons Law Firm, LLP, 3700 Montrose Boulevard, Houston, TX 77006 Telephone: 713-523-1606 Facsimile: 713-523-4159 EVIDENCE. A second tag had the label "**SNYDER** Hunting Chair (Top Portion)"

Barry B. Sutton, Esq.
June 4, 2017
Page Number 6

A similar tag was on the bottom platform that read: "**SNYDER** Bottom Portion Chain (1 of 1)."     It was attached to the chain still in the stand. A similar label was tied to the platform of the stand that read: "**SNYDER** Hunting Chair (Bottom Portion)." A tag was attached to the locking pin that read: "**SNYDER** Bottom Portion Locking Pin (1 of 2)." The same label was on the other side reading "(2 of 2)."    Another tag was on the Foot Bracket that read: "**SNYDER** Bottom Portion Foot Bracket (1 of 2)."    A similar tag was on the other foot bracket that read "(2 of 2)."

Inside the box was the top portion chain with a label reading "(1 of 2) and (2 of 2)."    There was a single locking pin in the box with a tag that read: "**SNYDER** Top Portion Locking Pin (1 of 1)." The second locking pin was not produced.

Measurements of the foot platform of the stand were made.    It measured from the back bar in front of the "V" to the front of the stand 28.50 inches and 19.60 inches wide.    It measured 18.50 inches from outside arm to outside arm. There was a bowholder and foot climbing stirrups on the platform.    Neither of the last two items were original equipment for the stand and are not manufactured by any company manufacturing API equipment.    The backpack straps were attached to the platform but had tape and material not original equipment on them.

The chain that had been inserted into the platform was marked with a gray marker on both sides of the platform and removed form the platform by Mr. Saunders. The right side chain was two holes into the stand, while the left side was eight holes into the stand. There are nine holes on each side. The chain measured 66.00 inches long from end to end.    Several of the holes on each end indicated the pin had been placed through them, thus the stand has been used on different size trees.

I observed a large dent or bending of the metal on the bottom of the second rung of the stand from the front end.    The foot bungee cord was observed to be attached.

There is pine sap observed on the teeth of the platform. There are scratches along the side rail of the stand.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 7

The locking pins were removed and examined..   There was a very noticeable difference in the color of the paint under where the pins were inserted into the stand. The chain was placed back into the stand at the location it was when we began the inspection.

Paint scrapes and scratches indicate this stand has been thrown about and not properly maintained.

The top section of the stand was next inspected.   The seat was laid out on the table. It was observed that the color of the material was faded where it has been exposed to sunlight. This stand has been left in the weather for extended periods of time. The arm rest and shooting rest camouflage are also faded along with the seat. There are scrape marks where metal has rubbed against metal in both arms of the seat platform.

The API and TMA labels   have been painted over with green paint. This label has an e-mail address of www.outlandsports.com.   This indicates this stand would have been manufactured between approximately 1999 and 2003. The TMA label signifies the stand has passed all TMA/ASTM standards that were in place at that time. TMA certification documents are consistent with the use of this sticker.

There is a considerable amount of rubbing around the edge of the stand insert where metal has rubbed against metal. It is very obvious that the plastic inserts for this stand have been removed from this area for a while.

The teeth of the stand have pine sap located on the edge just like the other section.

The seat platform was measured to be 23 3/16 inches wide by 32.00 inches long. There are several areas on the stand where the paint has been chipped and marks where the stand has been dinged by other objects. The stand has not been well-cared for. There is an area of glue on the side of the stand where the warning label was attached and has been removed.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 8

The subject chain was removed from the box and inspected along with the locking pin. The locking pin was in the seventh hole at the time of separation. The long part of the cable measured 51.50 inches and the short part measured 15.50 inches. There are several locations on the chain where the metal has rubbed through the plastic cover. The area of the stand where the locking pin attaches indicates the pin has been in place for a long time. The paint is discolored under the pin head.

Review of both chains showed they had not been replaced in the five years since the last possible date of manufacture.

Inspection of the ends of tubing which holds the chain shows that the plastic inserts were no longer present on the stand. On the upper portion of the stand there was evidence of interaction between the chain and the tubes, leaving grooves worn into the tubing. This evidence was easily discernable from any routine inspection.

## B.     Second Inspeciton of Subject and Exemplar Stands on January 24, 2017:

The first item inspected at this inspection was a firearm reported to be the one used on the date of the accident. It was a Savage with a serial number H203563 with an attached    Bushnell scope.

There were three boxes with stands presented for this inspection. The first box was opened and the contents placed onto the table.   It included the top and bottom sections of a stand along with   another new in the package set of chains and the warnings and instructions that came with them. There were several ropes and sections of webbing with the stand.

The stand had the name "OLSON" written in black ink on the side. The API Outdoors   label indicate that this is a GRAND SLAM BOWHUNTER MODEL GS2400. This is a different type of stand manufactured by a different company and   at a different time than the subject stand.   Other than where the stand was altered,   black plastic inserts which keep the metal chain from rubbing the metal side of the stand were present on this stand.   There are several warning labels on the stand about pin

Barry B. Sutton, Esq.
June 4, 2017
Page Number 9

placement and a CAUTION LABEL stating "SAFETY BELT MUST BE USED AT ALL TIMES"
API OUTDOORS. This indicates that this stand was manufactured prior to 2001 when API
begin including Full Body Safety Harnesses with the stands.

Several modifications have been made to this stand.   Holes have been drilled
into the platform in different locations, both on the platform and side arms of the stand.

The chain package was inspected and observed to have come from Global
Manufacturing Company in Windom, MN or Global Manufacturing Company is the
company that currently manufactures API brand treestands and has since approximately
2008-09.   This company did not start manufacturing API products until several years
after the subject stand was manufactured so this is not a true exemplar of the subject
chain.

The next box opened and stand inspected was an API MAGNUM Climbing
Treestand. This stand was also manufactured by Global Manufacturing of Windom MN
and is not a correct exemplar of the subject stand.   It was manufactured close to ten
years later.

This box was opened and the contents recorded. They include a "*Treestand
Safety: It's Up to You*" safety video along with the Warnings and Instructions for a 2014
stand.

The stand itself had a metal plate with the manufacturing date code of BG-0514,
GCL505-A.   This indicates this stand was manufactured in the fifth month of 2014.
This stand was manufactured by a completely different company than the subject stand.
 In my inspection video, you can see the black plastic inserts installed to keep the chain
from rubbing on the metal sides.   Also included were chains, Full Body Safety Harness
and accessories. The Full Body Safety Harness had a date code of July 2014.

The subject stand was again inspected and appeared the same as when inspected
years before.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 10


**C.    Site Inspection:**

By following GPS coordinates provided to us, we drove close to and then walked to the accident site location.    After a search of the area, the accident tree was located and matched to photographs supplied by the Plaintiff.

The subject tree was a tall pine tree.   It was located at GPS coordinates N 31*.06.503' by W 095* 02.787' plus or minus 12 feet.

There were climbing treestand teeth marks that matched an API Climbing stand located in the tree. These marks are documented in my video made on 1-24-2017 at the site.

The circumference of the subject tree was 48.50 (15.40) inches at approximately a foot off the ground.   At 70.00 inches from the ground it measured 41.25 (13.1) inches.

George Saunders climbed the tree and took several measurements from the location of the highest climbing marks located on the tree. The tree leaned from those marks 24 feet to four feet from the ground over 19.00 inches to the side the climbing marks were made on.


**II.    API OUTDOORS TREESTAND WARNINGS AND INSTRUCTIONS:**

The following are pertinent portions of the API Outdoors "Climbing Treestands Assembly & Usage Instructions" attached as an exhibit to Plaintiff's Deposition: These appear to be vintage instructions that match the stand at issue in this case. They state:

"**Weight Limits or Capacity**" for various API Climbing Treestands are set out for the user.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 11


Weight limit is defined as the total combined weight of the hunter, their weapon and all accessories they have while using the treestand.   Heavy boots, winter apparel and pack may add 10-20 additional pounds.
(Page 3)

**READ ALL INSTRUCTIONS**
**BEFORE USING THE TREESTAND!**
**NOTE: *Failure to read complete instructions before use***
***could result in serious injury or death.***
**\* \* \* \* \***


**IMPORTANT !**
**READ AND FOLLOW ALL**
**LABEL INSTRUCTIONS APPLIED TO**
**EVERY API TREESTAND**


**!   WARNING**
**BE SURE TO INSPECT ALL WELDS, STRAPS, BUCKLES AND HARDWARE AS WELL AS OVERALL INTEGRITY OF THE STAND BEFORE EACH AND EVERY USE.    FAILURE TO DO THIS IMPORTANT SAFETY STEP COULD RESULT IN INJURY OR DEATH.   CABLES OR CHAINS SHOULD BE REPLACED AS RECOMMENDED BY MANUFACTURER EVERY 5 YEARS OR AS NEEDED.**


**!   WARNING**
**FOR YOUR SAFETY, YOU MUST WEAR THE FULL BODY SAFETY HARNESS PROVIDED WITH YOUR STAND AT ALL TIMES WHEN USING THIS TREESTAND.    REFER TO THE SAFETY HARNESS INSTRUCTIONS IN THE DOCUMENT.**

**!   WARNING**
**VIEW THE ENTIRE SAFETY VIDEO BEFORE USING YOUR TREESTAND. ALWAYS CHECK TREESTAND BEFORE EACH USE.**
(Page 4)

Barry B. Sutton, Esq.
June 4, 2017
Page Number 12

## FULL BODY SAFETY HARNESS &
## CLIMBING SYSTEM INSTRUCTIONS
**FULL BODY SAFETY HARNESS &**
**CLIMBING SYSTEM**
MODEL # FSH-35

### !   WARNING
- ■ **FAILURE TO USE THIS SAFETY HARNESS COULD RESULT IN INJURY OR DEATH.**
- ■ **VIEW ENTIRE SAFETY VIDEO BEFORE USING THIS HARNESS.**
- ■ **THIS HARNESS IS DESIGNED TO RESTRAIN.   IT IS NOT INTENDED TO ARREST A FREE FALL.**

### WARNING
- ■ **INSPECT ALL PARTS FOR WEAR OR DAMAGE BEFORE EACH USE.**

(Page 5)

### CLIMBING THE TREE
Beginning at the bottom of the tree, slide the climbing strap up the tree as you climb.

\* \* \* \* \*

### !   WARNING
- ■ **DO NOT REMOVE THE SAFETY HARNESS AT ANY TIME WHILE CLIMBING OR AT THE HUNTING POSITION.   THIS COULD RESULT IN INJURY OR DEATH.**

\* \* \* \* \*

### VIEW THE VIDEO AGAIN TO ENSURE SAFE OPERATION
(Page 6)

### CLIMBING TREESTAND ASSEMBLY INSTRUCTIONS

Barry B. Sutton, Esq.
June 4, 2017
Page Number 13

## ASSEMBLY INSTRUCTIONS
* * * * *

5.    Install Heel Cord.   Insert cord into holes on the sides of the foot platform, tie square know at each end to secure. (Figure C)

6.    Install Lift Strap with the 1" slide-lock.    Place hunting boots on the foot platform and adjust strap to fit.    (Figure D)

7.    Attach the "Attachment Rope" to the lift strap using a "bowline" knot.   (Figure E) Tie other end of rope to the topside of the climbing seat section of the stand leaving approximately 3-4 ft. of rope length between the top and bottom sections.   This will prevent the foot platform from inadvertently dropping while in use and allows you to pull up the foot straps for use.    (Figure F)

## CHOOSING A TREE

**Select a tree that is between 6" and 20" in diameter. Inspect the tree to be sure it is straight and healthy.**

(Page 7)

## CLIMBING TREESAND USAGE INSTRUCTIONS
## INSTALLING THE STAND ON THE TREE
* * * * *

### STEP B
1.    Before climbing place the safety harness tether over either shoulder (Figure G)

(Page 8)

### STEP C
1.    Stand up and slide the safety harness tether up the tree as high as you can reach (Figure I)
* * * * *

### STEP G

Barry B. Sutton, Esq.
June 4, 2017
Page Number 14

1.   To sit facing away from tree, carefully stand and turn in the direction of the shoulder with the safety harness tether resting on it so the tether will slide off the shoulder and hang comfortably at your back.

### CLIMBING DOWN

**To climb down reverse Steps C through F.   DO NOT REMOVE THE SAFETY HARNESS TETHER FROM THE TREE UNTIL YOU HAVE REACHED GROUND LEVEL.**

(Page 9)

### CARE & MAINTENANCE
* * * * *

**It is required that owner replace chains or cables very five years or sooner as needed.**

(Page 11)

### III.   NBEF SAFE TREE STAND HUNTING STRATEGIES SAFETY VIDEO:

Outland Sports and API also shipped the NBEF "Safe Treestand Hunting Strategies" video with this stand.

The video was produced by the National Bowhunter Education Fund. The video warned multiple times of the dangers of falling if not wearing a harness. This treestand safety video has been on the market for use with treestands since 1999.     It has been co-packaged with millions of treestands since that time, including API products. API was the first treestand company that begin shipping this safety video with all stands in 2000.

This video discusses the use of a "Haul Line" to raise and lower all equipment to and from a treestand and emphasizes that the user must NEVER climb with anything on your back or in your hands.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 15


"82% of serious or fatal treestand accidents reported to the Consumer Products Safety Commission involved hunters who failed to wear a Full Body Harness."   This statement opens the video even before the information begins.

'WARNING: Watch this entire production prior to using a treestand. Failure to follow Safety Guidelines can result in death or permanent injury.'

Detailed use of a Full Body Safety Harness is shown from 5:07-10:30 of this video.

7:40    'A full body harness must be attached at all times whenever the hunter leaves the ground.'   This statement is quoted numerous times throughout this video.

11:07  'Prior to using any treestand or full body harness, read and understand the instructions and warnings provided by the manufacturer.'

11:27-12:16   Ground Level Training with a Full Body Safety Harness.

29:22  'This is a good time to consider what trees are suitable for your treestand.   Always select a straight, healthy and living tree that matches the diameter and description suggested by the manufacturer of your treestand.   Trees to avoid include dead trees, trees with loose or scaley bark and leaning trees.   NEVER rely on a branch for support at any time.   Broken branches are a common cause of accidents and it can be impossible to determine if a branch is healthy enough to support weight.'

34:30  'Inspect your treestand and all safety devices before each hunt.'

34:40  'Carefully re-tighten and inspect all bolts.   Inspect chains, straps, buckles and material for wear or damage before installing and

Barry B. Sutton, Esq.
June 4, 2017
Page Number 16

periodically throughout the season.   If any part of your stand's integrity is in question, contact your manufacturer before using.'

35:00  'Both written and video instructions should be kept in a safe place and reviewed at least annually.'

35:36  'Never leave your treestand attached to the tree for more than two weeks at a time.   Trees grow and the diameter of the trees increase and this growth can add tremendous stress to an attachment strap or chain.   Adding your weight may cause the stand attachment to fail.'

35:55  'Inspect your Full Body Harness before each hunt, look for damage that may be the result of sharp metal, broad heads, animals or just wear.   Inspect stitching for wear. Examine Carabineers and be sure they are in good working order.   Keep track of the age of your harness.   All TMA manufacturers have an expiration date sewn onto their harness.   If your harness is outdated, discard it and purchase a new TMA Certified Full Body Harness.'

IV.     **DEPOSITION OF DAVID L. SNYDER, MED:**

The following are pertinent portions from the Deposition of David L. Snyder, MED,   taken in this matter on March 1, 2017:

Q.     ...   I just want to make sure you don't have any instructions or videos that came in – came with it originally, do you?

A.     No, sir.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 17


Q.      Do you have the harness that came with it originally?

A.      No, sir.

(P.25, L.8-14)

Q.      Okay.   Fair enough.   Number 2 asks you for any safety harness
        you were using at the time of the incident.   Were you using any
        safety harness at the time of the accident?

A.      No, sir.

Q.      Okay.   Number 3 asks you for instructions, manuals, or videotapes
        or DVDs that accompany you.    You don't have those, right?

A.      No, sir.

Q.      Okay.   We asked for copies of your hunting safety certificate.
        Have you ever taken a course in hunter safety?

A.      Yes, sir.

Q.      Do you know when you took it?

A.      I sent copies of these in 2002.

Q.      2002.   At the time –

A.      I think that's accurate.

(P.26, L.1-17)

Q.      Number 6 asks you for any and all harnesses or climbing belts
        you've ever owned, used, or possessed.    Have you owned, used, or
        possessed any other harness or climbing belts?

Barry B. Sutton, Esq.
June 4, 2017
Page Number 18

A.      No, sir.
(P.27, L.6-10)

Q.      Okay.   Number 9 asks for any and all instructions of any tips for any other treestand you've ever owned or possessed.   Have you ever owned any other treestands?

A.      Yes, I have.

Q.      Okay.   We'll get to that in a minute.   Do you have any – any instructions or videos that came with any of those other treestands?

A.      No, sir.   I don't.
(P.28, L.2-10)

A.      After I – after I received my hunter's safety education, I got into hunting a little bit more and purchased my first API climbing stand, and it was an API Shooting Star, if I remember correctly.

Q.      And what type of treestand is that?

A.      It's similar (pointing), uh, to the API that I had, and it was later stolen.
(P.30, L.18-24)

Q.      And which climbing stands have you owned?

A.      (Pointing) that AP – API Grand Slam, I believe, the one there that –

Q.      The one that's the subject of this case, right?

A.      Correct.

Q.      Okay.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 19

    A.     And API Shooting Star.
(P.33, L.18-24)

    Q.     When you purchased the API Shooting Star, did it come in a box?

    A.     Yeah – well, yes, sir.

    Q.     And did it come with instructions and warnings?

    A.     I believe so, yes, sir.

    Q.     Did it come with a video?

    A.     I can't recall 2002 came with a video.

    Q.     If it did come with a video, would you have watched it?

    A.     I can't recall.

    Q.     Did you read the instructions?

    A.     Yes, sir.
(P.34, L.5-16)

    Q.     Okay.   Now the Shooting Star, was it a climb and sit –

    A.     Uh, yes.

    Q.     – stand?   So, in other words, when you were climbing on the upper portion, there was an outer bar in which you could put your – your butt on?

Barry B. Sutton, Esq.
June 4, 2017
Page Number 20

    A.      That was the Shooting Star had a, uh – that's why they didn't manufacture it very long.   You could fold it up (indicating).    It has a gun rest and then a place where you could lower down, but it wasn't one that would come all the way around (indicating) that you could climb with.

(P.35, L.10-18)

    Q.      Okay.   So, when you climbed using the Shooting Star, you would have to put all of your weight on your arms (indicating)?

    A.      Yes (indicating).    Everything's on your arms.

(P.36, L.4-7)

    Q.      And you knew based upon your background and based upon the instructions that you saw in the Shooting Star that any time you go up in a treestand, there's a danger of potentially falling, right?

    A.      Correct.

    Q.      As a result of, uh, this inherent danger that's in treestands, you knew as a consumer that it was really important to read and follow all of the instructions given by the manufacturer, right?

    A.      Uh, yes.

(P.37, L.9-18)

    Q.      So, you knew that whatever – for whatever reason there was a problem with that stand because it hadn't been properly maintained, that could cause an incident, right?

    A.      In regards to maintenance, I can never recall reading anything it said maintenance of – of the stand.   You keep the parts together. It shows you more – the instructions I used I can't recall anything in regards to stand maintenance.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 21


(P.42, L.24 through P.43, L.7)

Q.      And if the treestand manufacturer also provided a video, you knew
it was important to watch that video to make sure that you were
using the product in a proper and safe manner, true?

A.      I watched everybody use stands in different ways that they
considered safe, worked best for them.   And the way that you
attach the chains (indicating) especially with API, the size of trees,
the angles, there's a lot of different variations, and the video that
they showed was never – it was intended for the perfect style of tree
going up a certain height under optimum conditions.   And trees
that we would have been going up are pine trees.   The butts are a
little bit different.   You have to set the tree up different, set the
stand up different.   It doesn't ever – the video I've ever watched
never accounted for how the stand may as the tree shrinks, it starts
to angle down and then you try to safely come back down
(indicating), reattach the stand.   It never that I recall would go
through any of those kind of scenarios.   Those are things that you
just practice and learn with use.

(P.44, L.11 through P.45, L.6)

Q.      Okay.   And did you ever watch the one that came with the subject stand?

A.      I can't recall.   I can't recall watching that one either.

(P.46, L.11-14)

Q.      Okay.   And if there was a maintenance section, you would have
read it, true

A.      I would have – would have read it.

Q.      And you would have done your best to follow it, right?

Barry B. Sutton, Esq.
June 4, 2017
Page Number 22


    A.     Yeah, I would have.

(P.48, L.11-16)

    Q.     You indicated that you went in the store and you said something, this is not what I want, and you sent back and got something else, or this is what I want?

    A.     All the different stands are on a tree (indicating).   That's why I always insist on going to Bass Pro Shop versus anywhere else. You could make comparisons, see how they fit the tree, see the safety features.   And that's when I noticed at the time that my first API, the chain covering had changed.   It was a lot thicker (indicating).

    Q.     Okay.

    A.     It was quite a bit thicker.   And I – I liked the way that API bends into a tree.   It was very stable and I bought it for that reason. Also the bar that came, it come all the way around the front (indicating), and it was more safe.

(P.51, L.20 through P.52, L.10)

    Q.     Okay.   Is there anything else that sticks out of this memory of buying this treestand at this – at this store?

    A.     No, except I was just excited to get back to being able to start, um, hunting again.

    Q.     Okay.   When did this occur?

    A.     When did it occur?   Might have been in the summer of – 'cause my mother-in-law passed away that same – that same year and a lot of things were going on in the summer of that year.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 23


Q.      Summer of what year?

A.      Uh, 2 – 2008.    Probably by the late summer.
(P.54, L.21 through P.55, L.7)

Q.      Okay.    Are you sure about the year that you purchased this being 2008?

A.      It could have possibly been 2007.
(P.56, L.1-3)

Q.      Okay.    Did it come with instructions?

A.      I believe so, yes.

Q.      Okay.    And did you read the instructions?

A.      Correct.

Q.      And did you have any confusion with the instructions?

A.      Not that I recall.

Q.      Did it come with a video?

A.      Pretty sure that one did.

Q.      And did you watch the video?

A.      I'm pretty sure I watched that one.

Q.      And did you have any problems with that video or confusion with that video?

A.      No, sir.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 24


Q.     At any point in time did you feel the need to call API with any confusion or questions that you had related to any instructions on either the video or the written instructions?

A.     No.

Q.     Did it come with a harness?

A.     Yes.

Q.     And part of the instructions that it came with did discuss the use of harnesses, did it not?

A.     Yes.

Q.     And part of the video discussed the need and importance of using a harness, true?

A.     Yes.

Q.     Did it come with a stabilizer strap?

A.     A stabilizer strap?

Q.     It a strap used after you get at height to, uh, tie around the tree where the seat portion of the stand is used so that it doesn't shift?

A.     I can't recall.

Q.     Okay.   Did it come with a tether that tethered the two parts of the stand together?

A.     Um, I can't recall it having the tether strap.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 25


(P.59, L.20 through P.61, L.4)

Q.     And did you understand and comprehend that the instructions stated that, uh, that a harness should be attached to the tree from the time you left the ground until the time you returned?

A.     Yes, sir.
(P.62, L.3-7)

Q.     Was there a reason that you didn't wear harnesses?

A.     Yes, sir.

Q.     And what is that?

A.     Fear of suspension death.
(P.64, L.13-17)

Q.     Okay, Was there a reason you didn't use the harness in the original stand that you had, The Shooting Star?

A.     Was there a reason I didn't use a harness in that?

Q.     Yes.

A.     I don't recall. I guess it was a harness that came - - came with it. I didn't use the stand very much. It - - again, I'de like to reiterate, it was stolen from me.

Q.     And I understand it was stolen, but you didn't use it, right?

A.     Yes, I did use it.

Q.     And you didn't use the harness, correct?

Barry B. Sutton, Esq.
June 4, 2017
Page Number 26


A.      Correct, I did not use it.

Q.      Was there a reason you didn't use your harness when you had that
        stand, despite the instructions and warnings from the
        manufacturer?

A.      Still there was a certain amount of danger of hanging.   I wasn't as
        aware of the suspension death, but hanging suspended, um, in my
        mind didn't – the side of me – and this was also pre-cell phone and
        pre-everything, pre-communication – hanging suspended, um, I
        feared that even then before my cousin's incident – and my cousin
        will tell you that I told him 'cause he was hunting out of a borrowed
        stand – I said, "Wear your – wear your harness," because I thought it
        may be better for him to do so.   And, uh, in actuality, it may have
        harmed him more than it – than it helped him.   They're dangerous.
          There's no laws or regulations in regards to guidelines of
        harnesses and a harness is provided with very uncomfortable
        harrow straps.   They're awkward to put on.   You can get tangled
        up in them easily and they were a definite hindrance to anything
        that you've done.

        Also, when you watch a video trying to climb and slide (indicating),
        you're taking your hands off part of the stand and that in itself puts
        you at a safety risk.   Whenever you take your hands off that stand
        and you're trying to slide, the stand can go down.   Okay.   You're
        depending on one – one level of safety versus – versus two and
        slamming up against a tree again getting knocked out.   And it
        doesn't take – it doesn't take much when you fall and you face slap
        a tree.   And I realized it from his incident because he looked like
        he had been attached or mauled by a grizzly bear.   His whole side
        of his face (indicating) was scratched up.   Again, he's a lot bigger,
        stronger guy than I am.   He's shorter, but he's a lot stronger and

Barry B. Sutton, Esq.
June 4, 2017
Page Number 27

the only thing, again, that saved him was the fact the tree was small
enough he could grab it (indicating).

Most of the trees behind the National Forest are bigger pine trees
(indicating).    And there was no way I could have reached around
(indicating).    I would have – I would have been hung out.    Also,
the center of gravity on a – on the harness is when you fall, you're in
a real awkward position.    You're not going to be able to gain
much stability of – of being able to grab ahold of anything and
'cause it's kind of the equilibrium thing.    You're top heavy.
You're going to go head down.    The principal I worked – used to
work with told me – he was originally from Arkansas – he told me
about an incident of a gentleman that he knew that he hung head
down and they found him three days later.    And so his – there are
several different factors in doing it.

Cause to benefit, what would be my best scenario?    If the stand
broke, would I place all my trust in the stand?    My weight was
under the guidelines recommended by the manufacturer.    My
medical records will show I was way under the guidelines in regards
to weight.    I maintained and took good care of my stand.    I
always kept it inside.    It was either in the shed or in my closet
whenever I had it.    And the thicker chain it was impossible to – in
regards to inspection and maintenance, I always looked at my pins.
  It's impossible to not because you – you're pinning four different
pins (indicating) and a lot of times you have to readjust the tree and
get it at different angles because you have to look at the taper of
the tree (indicating) and make sure that if you're looking at a certain
height, that that treestand is as level and safe as you can get it.
(P.67, L.11 through P.70, L.16)

Q.    Okay.    So, I'm not sure what you mean by the word cumbersome.
So, let me ask you a few questions.    The harnesses are very
lightweight, are they not?

Barry B. Sutton, Esq.
June 4, 2017
Page Number 28


A.      The harnesses that were provided by the API stand were so
        lightweight, they fit in the palm of my hand (indicating) and they
        were made of a seatbelt material that was about that wide
        (indicating) and you had to put them together, put it together.
        So, yes, it was very, very, very lightweight.

Q.      So, by cumbersome you didn't mean that it was heavy.    You meant
        that it was what difficult to put on?

A.      It was – it wasn't that part.    It was – (indicating) – they – they were
        strapped to the tree and if you turned or moved or anything or if
        you had to stand and look up behind – or behind you, you'd kind of
        stand, you've got a rope and you can get hung up especially when
        you get buck fever as you mentioned and you turn and move at any
        angle, you can get caught up on the strap and, uh, put yourself in a
        very bad position.

(P.79, L.1-19)

Q.      Okay.    Did you ever try it on?

A.      I put it on.    I put it on, but I realized in other words, the
        narrowness of the – of the strip (indicating), the narrowness of the
        harness and the way that it was made, again, in the style in which
        we hunted.    The stand failure would – if that happened I always
        felt my survival rate would have been better without the harness
        than with the harness.

(P.80, L.15-22)

Q.      And I apologize.    My question related to harnesses that are
        produced for use in treestands, are you aware that all of those
        tethers are up at the shoulder area (indicating) which prevents
        people from hanging upside down.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 29


    A.     No, I wasn't aware of that.
(P.94, L.25 through P.95, L.5)

    Q.     Okay.  And one of the reasons that you tether the two stands together, you put a rope between the two was in the event that one of them, let's say the platform fell away, you could just pull it back up and reinsert on the tree, right?

    A.     It's not quite that – not quite that simple.

    Q.     Okay.  If you had a, uh, if you had a tether that was maybe three feet long or two feet long, right, that would prevent it from falling further than that away from the tree, right, or down the tree, right?

    A.     I'm – I'm sure it would.
(P.95, L.15-25)

    Q.     Did you ever replace any of the chains on these stands?

    A.     Un, no, not that I replaced the chain.
(P.108, L.20-22)

    Q.     Yeah, you know, hold on.  I'm going to show you the top in a second, but let me ask you a follow-up question on the bottom before we can move it – move it down.   At the end, you know, the chain fits – fits in there.   Was there ever any plastic inserts that went in there?

    A.     Um, none that I ever recall.

    Q.     Okay.   So, there may have been.   You just don't recall it?

    A.     None that I've ever been aware of.
(P.114, P.12-21)

Barry B. Sutton, Esq.
June 4, 2017
Page Number 30

Q.    And that's fair enough.   You can't say one way or the other as to
      whether there were ever plastic inserts that went in here, right?

A.    Well, it seemed like we never had used it, you know, 'cause the
      bottom had the plastic and you had the plastic and you slid it.   It
      had its V's on the plastic sliding, sliding up into – up into the stand.

Q.    So, you think there may have been plastic inserts at that point?

A.    I'm pretty sure.   I mean I – if they were in the bottom, they were in
      the top, you know, I would imagine.   I mean I really can't
      remember how it come.   It's just a long time since I looked at it
      and –

(P.118, P.13-25)

Q.    Okay.   Do you recall reading anything in the instructions about at
      a time to replace any, uh, pins or cables or bolts –

A.    No.

Q.    – or chains?

A.    No.

(P.121, L.6-11)

Q.    I want to show you now what we've marked as Exhibit 7, which is a photograph of
      the left side of this climbing portion of the – of the treestand.   And it shows –
      you see some – some damage to the end of, uh, of the place where the cables are
      inserted.   Do you see that?

A.    Yes, sir.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 31


Q.      Is that the type of damage you'd look for when you were inspecting the product?

A.      Well, it's because you thread it in there with your hand.    So, yes, I would have.    And it's an eye lev – it's at eye level and so I would have – I would have known about sharp objects and leverage, which had been a good combination.

Q.      So, if you saw the, uh, the damage we see in Exhibit 7, would that have been something that would have caused you not to use the stand (indicating)?

A.      Correct.
(P.133, L.10 through P.134, L.3)

Q.      And then, uh, and then you said you slept in the next morning on Saturday morning?

A.      Yes.    I was exhausted.

Q.      And this is November 16th, 2013; is that right?

A.      Yes, sir.
(P.143, L.19-23)

Q.      When you'd do that, do you recall whether or not there was any damage to the end of these holding areas (indicating)?

A.      No.

Q.      There wasn't any damage or you don't recall?

A.      I don't recall.
(P.152, L.10-15)

Barry B. Sutton, Esq.
June 4, 2017
Page Number 32


Q.     Did you use any – any strap or any other method of securing the
       top portion of the – of the stand to the tree?

A.     No.   I wasn't aware there was a way I could strap.   I mean to
       throw it, I would throw it around a pine tree and try [sic] the strap.
       And not a whole lot, you know, but you could do that.

(P.153, L.15-21)


## V.     <u>TEXAS PARKS AND WILDLIFE'S ACCIDENT/INCIDENT REPORT:</u>

The following are pertinent statements from the Texas Parks and Wildlife
Department's "Hunting Accident and Incident Report Form":

II.     SAFETY HARNESS USED!    _No

VIII.   Summary: Old chain support failed causing hunter to fall out of treestand.


## <u>OPINION</u>

There was nothing defective or wrong with the subject treestand when it was
manufactured or sold.   The subject treestand was certified by an independent testing
lab (MACTEC) as to all TMA/ASTM standards and met or exceeded all of those
standards. The accident occurred as a result of the failure to properly maintain and
inspect the stand, and to follow the written and video instructions provided. Mr. Snyder
would have avoided hitting the ground had he worn his full body harness as instructed.

Mr. Snyder's failure to follow both the written and video warnings and
instructions that he admitted receiving and reading and watching are the reasons for his
accident and injuries.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 33


According to the label on the stand itself, this stand was manufactured by Outland Sports. Outland purchased API in 1999 and begin manufacturing their stands in1999- 2000 time frame. They went out of business in or around 2003- 2004, with the last stands manufactured in or about 2003. The subject stand would have been manufactured between 1999 and 2003 and would have been at least nine to ten years old at the time of the accident. It was even noted by the Texas Wildlife Officer that the accident was due to an old chain.

The warnings and instructions clearly state that the chains are to be replaced every five years.
Had Mr. Snyder replaced the chain as required in the instructions, the accident would never have occurred.

The instructions discuss the importance of inspecting the product prior to use. Mr. Snyder admitted in his deposition that the damage seen on the ends of the tubes into which the chain was placed showed wear, and that had he seen this wear he would have removed the product from use. The wear appears to be the result of repeated interaction between links of the chain and the sides of the tube. The plastic inserts were not installed and/or were removed by Mr. Snyder leading to this interaction. Mr. Snyder testified that the plastic inserts were in at least part of the stand at one time. As Mr. Snyder admitted in his deposition, had he properly inspected the stand (at the location he admitted was easily visible) he would have removed it from use. His failure to follow the instructions and his own knowledge directly led to the incident.

Mr. Snyder's failure to follow the instructions relating to the use of a safety harness also led to his fall event. The instructions state that  that a full body safety harness must be worn at all times when the stand is in use. This is also stated very clearly in the video instructions and warnings. Mr. Snyder claims that he did not wear the harness for a variety of reasons, including fear of suspension death. I have been involved in the investigation of treestand accidents, and have worked with hunter safety and wildlife departments for over 35 years. I personally have investigated every death, that I am aware of, with a full body safety harness that has been reported. I am unaware of any actual suspension death that occurred from the use of a properly worn harness. The State Trooper death Plaintiff referenced was not in Iowa but Pennsylvania, and he died because he was on a severe leaning tree with an improperly worn harness. He released

Barry B. Sutton, Esq.
June 4, 2017
Page Number 34

the leg straps because he could not get back to the treeand the chest strap strangled him. In all the full body safety harness deaths, the leg straps have been removed or the harness misused. All of the cases were the user turned upside down were with single strap safety belts that were outlawed in 2003.

In my opinion, the chance of suffering serious injury or death are much greater from hitting the ground when falling at height. For this reason, every hunter safety program throughout the United States, the Treestand Manufacturers Association, every treestand manufacturer, The National Bowhunter Education Foundation, The International Bowhunter Education Foundation and many others universally state hunters should wear safety harnesses at all times from the point of leaving the ground until the point the user safely returns to the ground. This is the safest hunting practice. The possibility of dying if hitting the ground is obvious and was known by Mr. Snyder. A person failing to use a full body harness has a much greater risk of suffering injury or death in a fall than a person wearing a harness.

The chances of suffering suspension trauma using a climbing treestand like the one being used by Mr. Snyder is minimal. If Mr. Snyder had been sitting in the treestand with his full body safety harness properly attached and as reported in his deposition and the stand gave way, he would have been pulled backwards into the tree and used his foot platform to descend the tree without injury. The API full body safety harness from this time period attaches between the shoulder blades in the back and would have simply pulled his back into the tree. The foot platform did not dislodge so he could have stood up and used it to climb down the tree.

The warnings and instructions tell you to select a straight, non-leaning tree. Mr. Snyder choose to ignore all of these warnings.   The tree he used leaned over 19.00 inches from the platform to the ground.   This lean may have contributed to the accident by allowing Mr. Snyder to fall out of the treestand.

Mr. Snyder is incorrect about the years he purchased his treestands. First the API Grand Slam Shooting Star was only manufactured in 1997-2000. In 2001, Outland

Barry B. Sutton, Esq.
June 4, 2017
Page Number 35

changed the name from the Shooting Star to The Grand Slam Super Star and that was the last year it was manufactured. Outland went out of business in approximately 2003-2004, with 2003 being    the last year they manufactured treestands.

For clarification, The CPSC materials furnished in this case are for different manufacturers and different products than the subject stand. There has never been a recall of any API products that used a chain as the attaching device. The recall was for a cable type stand with a cable and not a chain as the attaching device.

The data used in the various expert reliance materials is not accurate. I personally have been involved with two research studies involving the CPSC and their NEISS collected data on treestands. The first research project was in 2006 and it involved accident data collected from 1998-2005. In 2008 we again conducted research on the same NEISS collected date from 2005-2007. I was involved in this research as a member of the ASTM Sub Committee on Treestands. Our findings were that the NEISS data is incorrect on treestands first because prior to 2003 they included ladders and scaffolding in the same category. Since then their data is incorrect because of adding things that are not even treestand related to the list. Some of those but not all are:

1.      Tick bite on groin while sitting in my treestand.

2.      Exposed to poison Ivy while putting up my treestand.

3.      Caught finger of door of my treestand.

4.      Was in the woods setting up my treestand and got stung by insects.
5.      Cut finger on saw while making a treestand.

6.      Chest pain while putting up my deerstand.

7.      Gun Shot Wound to leg after dropping my gun from my treestand.

8.      Carrying treestand on my head on my four wheeler and hit bump, cut head.

Barry B. Sutton, Esq.
June 4, 2017
Page Number 36

9.      Three year old dropped treestamd on foot in garage.

10.      Nerve damage to lower trunk while taking down treestand.

These are only 10 of 49 unrelated treestand accidents listed on the NEISS reports. This makes this data completely unreliable.

I have reviewed multiple documents produced by Plaintiff relating to suspension trauma. It must be clarified, there has never been a conducted survey or research on hanging in a Full Body Safety Harness designed for Treestands. In all of the survey's listed the subjects are free hanging from ropes and there are no trees for them to be attached too. Second, The TMA and ASTM outlawed single strap safety belts and chest harnesses in 2003. Since 2004 only full body safety harnesses have been shipped with treestands. Over 19 million harnesses have been sent with treestands.  Full body harnesses have saved hundreds if not thousands of lives.

In the article on the ,"Epidemiology of Tree Stand-Related Injuries in the United States From 2000 to 2007, several statements are made:

" A common source of tree stand related injuries are falls that can be partly attributed to the failure to appropriately use safety harnesses, which more than 50% of the injured tree stand users fail to do."

"In addition, it is possible that both homemade and commercial tree stands are included in the study though they cannot be differentiated."

"Second, we were unable to identify the direct mechanism behind the injury (i.e., the hunter falling from the stand, or improperly placed stand, or structial failure of the stand.)

**SUSPENSION TOLERANCE IN A FULL BODY SAFETY HARNESS, AND A PROTOTYPE HARNESS ACCESSORY** by several authors state:

Barry B. Sutton, Esq.
June 4, 2017
Page Number 37


Very few occupational cases of suspension trauma have been reported: therefore, the actual scale of this occupational problem is unknown.

### DEER STAND FATALITIES IN KENTUCKY
### TWO CASES OF REVERSE SUSPENSION AND BLUNT FORCE TRAUMA BY
### Lisa B. E. Shields, MD and Donna Stewart, MD

Study 1 was a 65 year old male that died from reverse hanging suspended in a homemade treestand by his legs by a nylon-webbed rope. He was not wearing a safety harness. He had had a 3-vessel coronary bypass graft 9 years before and complained of chest pains 6 days before and was evaluated by his family doctor 3 days before.

Study 2 was a 65 year old male that fell approximately 20 feet from his homemade stand. He also was not wearing a safety harness so he hit the ground and was pronuced dead upon arrival at the hospital.

Under the DISCUSSION topic certain statements are made:

"Various methods have been introduced to increase the safety of using a tree stand, including using a commercial model instead of a homemade device as well as wearing safety gear."

" Hunters also have the option of wearing a safety strap or harness which is designed to support the hunter if he or she should fall."

" Spinal cord injury represents one of the most devastating sequelae ensuring after a fall from a deer stand, with a degree of injury varying from incomplete paraparesis to complete quadriplegia. Three comprehensive studies in various states (Louisiana, Oklahoma, Pennsylvania) were conducted to determine   the incidence of spinal injuries after falls from tree stands. In each of these studies, none of the victims wore safety devices at the time of the injury.

Recommendations of these writers to prevent accidents are:

Barry B. Sutton, Esq.
June 4, 2017
Page Number 38

1.    Avoid hunting alone or hunt with two or more in a group.

2.    Perform annual inspection of the construction of treestands and safety
equipment as wooden stands decay.

3.    Hunters should avoid all alcohol and drugs and tree stands should not be
used by those with significant medical conditions that increase the risk of
falling.

4.    Use a safety harness at all times.

All of these studies reach the same conclusion. That is, If Mr. Snyder had been
properly wearing his supplied API Full Body Safety Harness, he would not have fallen to
the ground and been injured.

All of the opinions given in this case are within a reasonable degree of certainly
according to hunting safety and treestand safety principles of use and training and in
accordance with established principles of hunting and treestand accident investigation
and reconstruction.

I reserve the right to alter or change this opinion as information is received
through the discovery process.

If you have any questions, or if I can provide you with anything further, please
give me a call.

Sincerely,

SMITH INVESTIGATION & SUPPORT SERVICES, LLC

By:    Lorne Smith, Jr.
       LORNE SMITH Jr.

LS,JR/ly
Enclosure